**UNITED STATES v. TRUST NO. B. I. 35, BANK OF AMERICA NAT. TRUST & SAVINGS ASS'N.**

**No. 9129.**

Circuit Court of Appeals, Ninth Circuit.

Oct. 25, 1939.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Norman D. Keller, James P. Garland, and Arthur A. Armstrong, Sp. Assts. to Atty. Gen., and Ben Harrison, U. S. Atty., E. H. Mitchell, Francis C. Whelan, and Armond Monroe Jewell, Asst. U. S. Attys., and Eugene Harpole, Sp. Atty., Bureau of Internal Revenue, all of Los Angeles, Cal., for appellant.

M. F. Mitchell and George G. Witter, both of Los Angeles, Cal., for appellee.

BEFORE WILBUR, DENMAN, and STEPHENS, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment of the district court for refund of taxes paid by the appellee, the court holding invalid the assessment against and collection from appellee of taxes on income for the tax years 1931 to 1933, inclusive, as earned by an association, and also the assessment of and collection as from an association an excise tax on dividends paid in 1933 to the holders of certificates of beneficial interest in the trust. The district court held the trust income was that of the traditional type of trusts and not of a business trust as defined by the Supreme Court in Morrissey v. Commissioner, 296 U.S. 344, 357, 56 S.Ct. 289, 295, 80 L.Ed. 263, in the following language:

"* * * In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains. Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate, the development of tracts of land, the construction of improvements, and the purchase, management, and sale of properties; or for dealings in securities or other personal property; or for the production, or manufacture, and sale of commodities; or for commerce, or other sorts of business; where those who become beneficially interested, either by joining in the plan at the outset, or by later participation according to the terms of the arrangement, seek to share the advantages of a union of their interests in the common enterprise."

On the argument it was not questioned that the trust was organized in corporate form. Cf. Morrissey v. Commissioner, supra, 296 U.S. 359, 56 S.Ct. 289, 80 L.Ed. 263; Helvering v. Combs, 296 U.S. 365, 368, 56 S.Ct. 287, 80 L.Ed. 275. The trustee is to act under the direction of a so-called advisory board which has the power not only to advise but to direct the trustee in the conduct of the enterprise created by the trust. Here was centralized management.

The beneficiaries of the trust have participation certificates transferable by endorsement. Vacancies in the directing committee are filled by election by the holders of the certificates.

The single question for our disposition is whether the trust was "created and maintained as a medium for the carrying on of a business enterprise and sharing its gains * * *". Morrissey v. Commissioner, supra, 296 U.S. 359, 56 S.Ct. 296, 80 L.Ed. 263.

The Fox Oil Company, a California corporation, had been engaged in the business of ownership and leasing of certain proven oil lands and in the storage, settling and sale of the oil received from its lease royalties in Kern County, California. In 1920 it owned 120 acres of such land and was engaged in the business of selling the oil. This business of selling the oil was conducted by the Fox Company through its agent who attended to the storage and settling of the oil, its classification as to its various grades, procured purchasers therefor, and provided transportation to the buyers.

On October 20, 1920, the Fox Company transferred to the trustee under the trust indenture here described the title to the 120

acres of oil land,* three leases thereon covering its entire area, and the agreement under which the then agent performed for its principal the business of storage, settling, classifying, grading, transporting and selling the oil. With regard to the enterprise for handling and disposing of the oil in 1929, some 13 months prior to the first tax year in question, a new agent was employed by the trustee who performed these various functions for the trustee, its principal, leading to collection of the proceeds of the sales constituting the income upon which the challenged assessments were computed and made.

■ The size and complexity of the trust enterprise of caring for and disposing of the oil is not shown in exact description and figures. Since the burden is on the taxpayer to adduce facts showing the Commissioner's assessment is wrongful, Germantown Trust Co. v. Lederer, 3 Cir., 263 F. 672, 676, we must assume that if size and complexity are pertinent in this case to constitute a business for profit those factors are present. In amount the oil sales must at times require extended business activity by the trustee acting through its agent, for the tax on income from oil sales by the trustee at one time required the borrowing of $20,000.00 for its payment. Moreover, the Supreme Court has held in Helvering v. Combs, 296 U.S. 365, 368, 56 S.Ct. 287, 80 L.Ed. 275, that lack of size and complexity of business do not necessarily prevent a trust from being taxable as an association.

■ The trust instrument contemplated this continuous and diversified function of the trustee. The transferred agreement with the agent so to serve the trustee principal, though called a "sales agreement", in fact was an agreement for this collection, custody, treatment and *procuring* of sales of the oil. Concerning such contracts of agency the trust instrument provides "During this Trust, and to enable it to properly execute this Trust, the Trustee shall have full power to * * * negotiate new sales agreements for the disposition of the royalty products of the property at or before the expiration of the present sales contracts to take care of said products when said sales contracts expire should it be deemed advisable to sell or dispose of the royalty products in that manner, * * *."

If the trustee had decided to have several agents to perform the several functions respecting the oil, that is, not "in that manner" of the previous agency contracts, it had the power to make different contracts under the following provision of the trust agreement:

"Said Advisory Committee shall have the right and power *to direct said Trustee* to sell, lease, re-lease, or enter into any agreement or agreements, which in their judgment would be for the best interest of the beneficiaries in connection with the management and control of said Trust Estate and property, and it shall have the right and power to direct said Trustee to expend such sums of money out of the funds in its hands as such Committee may deem necessary for the care, maintenance and upkeep of said Trust Estate, or for incidental expenses incurred in such care and upkeep.

\*   \*   \*   \*   \*   \*

"Said Trustee shall have the right and power, by and with the consent of the Advisory Committee, to make any sale, contracts or leases covering said Trust property, as in its judgment may seem best, being always advised and guided therein by the Advisory Committee hereinbefore appointed." (Italics supplied.)

We hold the functions of the trustee with reference to the collection, care and disposal of the oil constituted a business for profit. Cf. Commissioner v. Boeing, 9 Cir., 106 F.2d 305, 309.

Each of the leases shaped the duties of the tenant with respect to the development and exploitation of the petroleum deposits. They required wells to be drilled in the lessor's land until a certain number was reached, and for their care and continued pumping as long as the oil therefrom was saleable, above a minimum fixed price.

Obviously, in making leases with such requirements from its lessees, the owner of the land is engaged in a creative enterprise for profit, just as it is engaged in such a creative enterprise when it stores, settles and transports the oil to its buyers.

The lease of the land terminated at the end of 20 years, with the right of the lessee to continue to operate such wells as were producing at the end of the lease term. There were no provisions in the leases prohibiting, after their termination, the drilling

---

* The printed transcript omits the transfer of the title to the land, but it appears in the exhibit in the record here of the trust instrument.

of competing wells near those producing at their termination. The owner either could drill such wells itself, invade the oil pool of the existing wells and possibly obtain a higher return than the royalty from the existing wells, or it could lease the adjoining area to exploiting lessees who would pay the owner a higher royalty for the oil than that from the operator of the existing wells into the same lands.

■ Apart from such competing wells in the proven sands, on the termination of any lease the owner could make new leases for the entire area to seek for other petroleum stratifications, or it could sell all or part of the land to those desiring so to exploit the land as owners. It may very well be that when the leases were made the existence of such deposits was indicated but at a depth which the then existing development of drilling mechanisms could not reach or could penetrate only at a prohibitive cost. The court takes judicial notice of the great increase in depth in practical drilling in the last thirty years. In 1926 the trustee contemplated when it made a new lease of a 35 acre parcel of the trust land and the lease provided that during all its 20 year term, the lessees could cease pumping and deepen the wells to reach other deposits.

Of the three leases assigned to the trustee, one for 35 acres, called the Fox lease, was terminated by the agreement of the trustee and lessee on August 11, 1926, about 4½ years before the beginning of the tax years in question. Another, for 42½ acres, called the Van Slyke lease, expired on January 18, 1931, in the first tax year; and the other, for 42½ acres, called the Smith lease, on February 3 of that year. The termination of the Fox lease in 1926 presented to the trustee and its directing committee the problem of how to make profitably productive for the benefit of the holders of its beneficial certificates the 35 acres of which it held the fee now free of lease. In essence the problem and function was no different from that of the manager of any business corporation. The trust instrument contemplated and created such a function in the trustee and the directing committee in the first sentence of Article 2 of the trust agreement providing: "During this Trust, and to enable it to properly execute this Trust, the Trustee shall have full power to hold the property, oil leases and sales agreements received or to be received by it, and *in the event of the lapsing or the termination of any of said*

*leases for breach of covenant or other cause,* by and with the consent of the Advisory Committee hereinafter named, *to negotiate and execute other oil leases on the property* in place of the leases forfeited, for terms, either within or beyond the duration of this Trust, * * *." (Italics supplied.)

On August 11, 1926, such a new and different lease of the 35 acres was made to the Jergins Trust. The term was for 20 years and the lease contained the usual oil leasing provisions. Its creative character differed from the preceding lease of the land in requiring the new lessee to drill a greater number of wells. That the making of the Jergins lease was regarded by the taxpayer as for oil production for profit is shown in the approval of the Advisory Committee stating "that said committee is firmly convinced that the new lessee will be able, by proper production methods, to produce a larger income on said trust property than has heretofore been received." We have so held in Title Ins. & Trust Co. v. Commissioner, 9 Cir., 100 F.2d 482, 485.

■ What part of the oil creating the income for the tax years in question came from this leasing enterprise of the trustee does not appear and, since the burden is on the taxpayer, we hold that it supplied a substantial amount of the income on which the tax was assessed.

The expiration of the Van Slyke and Smith leases came early in 1931. In the succeeding years of the great depression nothing was done and probably nothing could have been done by the trustee and advisory committee to increase the production and profit to the certificate holders by procuring new lessees for the land which the lease expirations made free for such enterprise. It was the period in which the prorating laws and regulations of California made oil land investors hesitate.

However, in 1938, the trustee again was able to increase the productivity of its oil land by new agreements with the then operators of the wells producing at the lease expirations. These agreements permitted these operators to drill "one or more" wells, that is as many as they wished, on the two tracts of 42½ acres each of the former Van Slyke and Smith leaseholds. The new agreements did not purport to lease any specific part of the land and did not exclude other operators and it would appear that the trustee now owns a very considerable acreage from which its man-

agement may increase the oil production and profit to the certificate holders.

The appellee Trustee claims that such an enterprise is not an association of individuals in a productive enterprise for profit. Its contention is based on several false premises. The trustee erroneously assumes that the collection, storage, settling, classification for grade and quality of a large quantity of oil continuously produced and to be produced over many years time and the finding of customers of its various grades is not a business transaction for profit. We infer from the argument that these acts are deemed to lack the attributes of a business because the trust company does not perform some of them itself but through its agent, the Independent Oil Producers Agency, but it is apparent that a corporate trustee can act only through agents.

Another false premise is that the trustee has no other duty regarding the land than the holding of leases and collections of their royalties. As seen, it held in the tax years in question 85 acres of unleased land, concerning which the trust imposed on it the obligation to make it as profitably productive for its certificate holders as its predecessor Fox Oil Company owed its shareholders, and also held 35 acres under a lease which the trustee itself had made for a profitable production.

Another false premise is that no one other than the trustee received any payment for services rendered the trust. On the contrary, for the years of extensive and diversified services to the oil itself, as above described, the trustee's agent received not only a commission on the sales but storage and transportation compensation which must have amounted to large figures.

A further false premise is that the owner of oil land, some leased and some free to lease, with oil sands developed at a certain depth and (in Kern County) the contemplated possibility of still deeper deposits, is not engaging in a productive business for profit when its lessee extracts the oil, but is merely liquidating its capital investment. To state the proposition is to refute it. The contrary would make free from taxation as an association of corporate character every trust which cut logs from the standing timber it owned, as are held apart from the land millions of stumpage in Pacific forests, and, indeed, every such trust operating a gold mine. The terms of the trust instrument best refute this argument, for it contemplates and provides for the distribution of "profits" as well as the liquidation of the capital assets by distribution of the capital: "* * * it shall be the duty of the Trustee to receive the rents, royalty and profits from the property, oil leases and sales agreements and at any time during the terms, or upon the expiration of this Trust in whole or in part, make full and complete distribution of any *rents, profits, income or principal* arising from such Trust property in the manner hereinafter provided." (Italics supplied.)

We hold that the trustee here was not administering a so-called "traditional type of trusts", but a "business trust" within Morrissey v. Commissioner, supra, conceived and intended to be conducted as a productive business enterprise for profit, and that it was in fact so conducted.

The trustee is not entitled to its claimed refunds and judgment should be entered below for the United States and for its costs.

Reversed.