## SHERMAN v. COMMISSIONER OF INTERNAL REVENUE (two cases).

## CENTRAL NAT. BANK OF CLEVELAND v. SAME.

### No. 9714.

Circuit Court of Appeals, Sixth Circuit. Dec. 14, 1944.

L. C. Wykoff and Ashley M. Van Duzer, both of Cleveland, Ohio (Ashley M. Van Duzer and Arthur E. Griffith, both of Cleveland, Ohio, on the brief) for petitioners.

Leonard Sarner, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, Robert N. Anderson, and S. Dee Hanson, all of Washington, D. C., on the brief), for respondent.

Before ALLEN, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

These three cases involving identical issues, were consolidated for hearing in the United States Tax Court and also in this court on review, sought by the petitioning taxpayers. To avoid unnecessary restatement, we have set forth in a footnote the Tax Court's complete findings of fact, which have been accepted both by the petitioners and by the respondent Commissioner of Internal Revenue.[1] The deficiencies determined by the Commission-

---

[1] Findings of Fact, filed by the United States Tax Court.

Henry S. Sherman and Edith McBride Sherman are husband and wife and filed separate income tax returns in the 18th District of Ohio.

Prior to March 1, 1913, Sarah R. Benedict owned two parcels of real estate in the business section of Cleveland, Ohio, one referred to as the Arcade property and the other as the West Side property. In 1886, she executed a 99-year lease covering the Arcade property, at an annual rental of $5,000 payable in quarterly installments, or at such increased rental as may be determined at ten year intervals at the rate of 4 percent upon the appraisal value of the land but not less than $5,000 a year. The building now on the premises was constructed by the lessee. On or about September 19, 1889, Sarah R. Benedict leased the West Side property for 50 years beginning April 1, 1890, at an annual rental of $1,000 for the first two years, $1,250 for the third year, and $1,500 for the remainder of the term, payable in quarterly installments. All taxes were to be paid by the lessees and all repairs were to be made at their expense. At the expiration of each lease the lessor, her heirs, executors, administrators and assigns, was to pay to the lessee the value of the buildings and improvements erected by the lessee.

Sarah R. Benedict died prior to March 1, 1913, and the two parcels descended by inheritance as follows: An undivided one-half interest to Mary B. Crowell, her daughter, and an undivided one-fourth interest to each of her grandchildren, Henry S. Sherman, and his sister, Sarah Sherman Carter, subject to a life estate in their mother, who died in 1929.

On May 7, 1925, Mary B. Crowell conveyed her one-half undivided interest in the Arcade property and the West Side property to Central National Bank Savings and Trust Company of Cleveland, in trust. The net income was to be paid to the grantor for life, and upon her death $35,000 was to be paid to her daughter, Katherine Crowell Cushing, and the residue was to be divided into three parts and the income of each part was to be paid to each of her three children, Benedict Crowell, Katherine Crowell Cushing, and Robert H. Crowell, during life, or to their issue per stirpes. The trust was terminable twenty years after the death of the last survivor of the three children, whereupon the trust principal, and any accumulated income, was to be distributed to the issue of the deceased children in the same propor-

er of Internal Revenue and upheld by the Tax Court were in income taxes for 1939.

Two questions of law are presented: (1) Was the trust created by the declaratory indenture of March 16, 1931, between the bank, as trustee, and the parties of the second part as beneficiaries an. "association" taxable as a "corporation" within the scope and meaning of Section 3797 of the Internal Revenue Code, 26 U.S.C.A.Int.Rev. Code, § 3797? (2) Did the petitioning taxpayers realize capital gains upon the termination and final liquidation of the trust in 1939 within the meaning and coverage of Section 115(c) of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 115(c)?

The Tax Court held that the Commissioner of Internal Revenue had properly

---

tions as that of the last distribution of income. This trust agreement has been since its execution and is now in full force and effect.

In 1931, the children of the life beneficiaries of the Mary B. Crowell Trust and of Henry S. Sherman and Sarah Sherman Carter numbered about thirteen, and it was feared that partition proceedings might be instituted resulting in a forced sale of the properties. To avoid partition of the properties a trust agreement was made on March 16, 1931, between the Central United National Bank of Cleveland (now Central National Bank), as trustee, and Henry S. Sherman, Sarah Sherman Carter, and Central United National Bank of Cleveland, trustee under the Mary B. Crowell Trust, as second parties. Second parties agreed, contemporaneously with the execution of the trust, to convey their rights in and to the Arcade and West Side properties to the trustee. This agreement provides, inter alia: that the trustee shall convert the property into money and disburse the proceeds to the persons owning beneficial interests as evidenced by certificates of interest issued by the trustee; that the trustee may in its uncontrolled discretion postpone such conversion and distribution but not more than twenty years after the death of the last survivor of eighteen persons named in the agreement; that the trustee shall have exclusive control over the trust estate, including: the right to collect all moneys; to require the lessees to carry fire and liability insurance; to pay taxes and assessments against the trust estate not otherwise payable to the lessees; to give necessary attention to the proper management of the trust estate; to execute, without the consent of certificate holders, leases not exceeding ten years; to execute new leases for all or any part of the trust estate for a period of 99 years, renewable forever, with or without purchase option, and for such rents as it may, with the approval of ¾ths in interest of the certificate holders, deem advisable; to modify any existing lease with the written consent of ¾ths in interest of the certificates outstanding; to mortgage the trust estate or receive advances, upon the security of the trust estate, for its improvement, protection or preservation, including the payment of taxes and assessments; in the event of partial or total destruction of any building on the lands during the existence of any lease, to take such action as it may deem proper with reference to the repair and restoration of the building, and in the event of the termination of the present long term leases, at the request of ¾ths in interest of the certificate holders, to tear down the old buildings and to erect new buildings and for such purpose to borrow money and mortgage the trust estate. The trustee was to keep complete records and accounts of business transacted by it, which should be open to inspection to any certificate holder; to render annually a complete statement of its receipts and disbursements, including an inventory to each certificate holder; to pay out of the income received "any and all expenses incurred in the management of the trust estate and any charges and expenses incurred by the Trustee or for which it shall be liable in connection with its management" of the trust estate; to distribute the balance on the 15th of each January, April, July and October among the certificate holders.

The trust agreement further provides, that until the conversion of the property the certificate holders shall have no legal estate in the property and no right to partition, their interest consisting only of a right to the net income and the net proceeds upon sale or other disposition; that the death of a certificate holder shall not terminate the trust; that the beneficial interest under the trust shall be divided into 1,200 parts and evidenced by "Trustee's certificates of interest;" that contemporaneously with the execution of the agreement the trust shall issue and deliver certificates of interest as follows:

Central United National Bank
of Cleveland, Trustee under
the Mary B. Crowell Trust 600/1200
Sarah Sherman Carter 300/1200
Henry S. Sherman 300/1200

Pursuant thereto such certificates were issued. The certificates were transferable in writing and new certificates were to be issued upon a transfer.

characterized the trust of March 16, 1931, as an "association" taxable as a "corporation" under Section 3797; and sustained the Commissioner's affirmative answer to the second question. It is insisted by the petitioners that the tax court erred in both conclusions.

(1) The petitioners contend that the findings of fact demonstrate that the trust was not employed as a substitute for a corporation, but was created by members of a family for the purpose of eliminating the danger of sale for partition of the proceeds of jointly owned real property, not capable of partition in kind, by the conveyance of the legal title to a trustee empowered to collect and distribute rents in proportionate shares; that no operation or management of the property by the trustee was necessary; and that the trustee, in fact, transacted no business pertaining to the property conveyed. They say that, in no aspect, did the trusteeship arrangement constitute a business venture or the doing of business, or a subterfuge to obtain corporate advantages without paying corporate taxes, but was strictly a family affair to assure the consummation of their common desire that family property should remain family property. They point out that under Ohio law land trust certificates are interests in real estate, and are not personal property. Senior v. Braden, 295 U.S. 422, 55 S.Ct. 800, 79 L.Ed. 1520, 100 A.L.R. 794.

The trustee was granted exclusive power and control over the trust estate; was empowered to collect and receive all moneys accruing therefrom, and, in general, to give "such attention to the proper management of the trust estate as may be necessary." The trustee was directed to require the lessees to carry insurance and to pay taxes and assessments on the trust property, and upon forfeiture or termination of leases, to carry the insurance and receive reimbursements from the trust estate. The trust instrument instructed the trustee to "keep the premises in repair,"

The trustee in its discretion could call meetings of the certificate holders for the purpose of submitting to them any question or policy in respect to the trust estate. Meetings were also to be called upon the written request of 25 per cent or more of the outstanding certificates specifying the matters to be considered at such meeting. Each holder of a certificate, or proxy, was entitled to "act or vote" at such meetings according to the interest represented by the certificate.

The trust was terminable upon the unanimous written request of the certificate holders requiring the trustee to transfer the trust estate to them or their nominee.

The trust agreement further provided that the trustee should have no power or authority to borrow money on the credit or on behalf of the certificate holders or to make any contract on their behalf for the repayment of any money, or to bind or to make any contract or incur any liability on behalf of the certificate holders, or to bind them personally. The trustee was to stipulate in all written contracts or obligations that neither the certificate holders nor the trustee should be held to any personal liability.

In 1933, petitioner Edith McBride Sherman purchased a 200/1200 interest from her husband, Henry S. Sherman, for $97,-000.

On June 29, 1939, all of the owners of the certificates of interest terminated the trust, notifying the trustee and requesting it to convey the trust property to them. Shortly thereafter the trustee did so.

Benedict Crowell was president of the Central National Bank of Cleveland. During the existence of the 1931 trust the trustee collected the rents, deducted its fees and distributed the balance to the holders of the certificates in proportion to their interests. The lessees took care of repairs, if any. The trustee in 1937, upon the final decision of the beneficiaries, made an adjustment of the rent of the West Side property with The Ohio Postal Telegraph-Cable Company, to which the original 50-year lease had been assigned in 1920. An adjustment of rent based upon a reappraisal of the Arcade property was also made in 1937 or 1938, the negotiations for which were carried on by Henry S. Sherman and Benedict Crowell. On occasions during the depression the trustee called the lessees with respect to its failure to receive their rent checks on time. The trustee had no occasion to call a formal meeting of the certificate holders. It kept books of account and a record. During the existence of the trust the only transfer of certificates recorded was the one from Henry S. Sherman to Edith McBride Sherman.

In determining the deficiencies the respondent determined that the petitioners in 1939 realized long term capital gains from the liquidation of the March 16, 1931, trust as follows:

Henry S. Sherman — $ 5,076.66
Mary B. Crowell Trust — 30,458.95
Edith McBride Sherman — 10,052.99.

unless the leases required the lessees to do so. In the event of forfeiture or termination of existing or future leases, the trustee was vested with discretion to make new leases. Leases for a term not to exceed ten years could be made without the consent of the certificate holders; existing leases could be modified with the consent of three-fourths in interest of the outstanding certificates; and the trustee was given authority "at any time," with the approval of such three-fourths interest, to lease all or any part of the trust estate for a period of ninety-nine years, "renewable forever, with or without purchase option," upon such terms and conditions and for such rents as it might deem advisable. The trustee was empowered to mortgage and encumber the trust property for the improvement, protection, or preservation thereof, and for the payment of taxes and assessments thereon. Money could be borrowed and the property mortgaged by the trustee for the repair or restoration of any building thereon, partially or totally destroyed during the existence of any lease; and upon the termination of any existing long-time lease, the trustee, at the request of three-fourths in interest of the certificate holders, was directed to demolish existing improvements on the trust property and to erect new buildings thereon. For such purposes, the trustee was authorized to encumber the trust property.

The trustee was required to keep true and complete records and accounts of *"all business transacted by it;"* to render to each certificate holder annually a complete statement of its receipts and disbursements and an inventory of all assets and property then belonging to the trust estate; and to pay from the rents and other income of the trust estate any and all expenses "incurred *in the management of the trust estate,* and any charges and expenses incurred by the trustee or for which it shall be liable in connection with *its management of the trust estate."* [Italics supplied.]

Subject to the provisions of the trust agreement, the trustee was directed to convert the lands received in trust into money, and to disburse the proceeds of sale to the persons owning beneficial interests as evidenced by certificates of interest issued by the trustee; and in its uncontrolled discretion, could postpone such conversion and distribution for any period not more than twenty years after the death of the last

survivor of numerous persons named in the declaration of trust.

During the existence of the trust, in addition to collecting rents and distributing the proceeds therefrom to certificate holders after deduction of its fees, the trustee, upon the final decision of the beneficiaries, made with the lessee an adjustment of the rental payable under the fifty-year lease on the West Side property; and also adjusted the rent based upon a reappraisal of the Arcade property, negotiations for which had been carried on by two of the beneficiaries. During the depression, the trustee occasionally called upon the lessees for payment of delinquent rent. Upon appropriate demand and delivery, the trustee reissued one certificate of interest for 300 of the total 1200 parts transferred by Henry S. Sherman to his wife, Edith McBride Sherman. Records and books of account were kept by the trustee. The Commissioner of Internal Revenue contends that these actions of the trustee constituted "doing business"—one of the tests to be applied in determining whether the trust was truly an association within the intended scope of the pertinent internal revenue act.

Other provisions of the trust agreement, not heretofore mentioned, assimilate the motivation of the trust to purposes usually accomplished by the organization of a corporation. It was provided that certificate holders could be held to no personal liability by any contract or obligation of the trustee, and that such exemption must be expressed in all documents executed by the trustee. The trust was terminable upon the unanimous request in writing of the certificate holders, but death of any or all of the certificate holders would not terminate the trust. Beneficial interests in the trust consisted of 1200 parts, evidenced by "trustee's certificates of interest," which were transferable in writing. New certificates were to be issued to transferees and every transfer was required to be recorded upon a transfer book to be kept by the trustee. Lost certificates were to be reissued upon evidence satisfactory to the trustee and upon such reasonable terms as to indemnity as the trustee might prescribe.

The trustee was authorized to call meetings of the certificate holders for submission to them of "any question or policy in respect to the trust estate." The trustee was required to call a meeting upon request

in writing of not less than twenty-five percent in interest of the outstanding certificates. Any such request must specify the matters or questions to be considered at the meeting. Ten days' notice, specifying the time, place and object of a meeting, was required to be sent by registered mail to each certificate holder. A certificate holder could appoint a proxy to represent him in a meeting. A majority in interest of the certificate holders was necessary to constitute a quorum. Subject to limitations elsewhere provided in respect of the powers of certificate holders, the majority in interest could act upon any question specified in the notice of meeting. In the aggregate, these provisions of the trust instrument are most reminiscent of certain standardized sections of corporate by-laws.

Section 3797(a) (3) of the Internal Revenue Code distinctly defines the term "corporation" as inclusive of "associations."

Treasury Regulations 103, promulgated under the Internal Revenue Code (Section 19.3797-1), declare that for taxation purposes the Internal Revenue Code prescribes its own standard of classification; that local law is of no importance in this connection; that a trust may be classed as an association (and, therefore, as a corporation), "depending upon its nature or its activities;" and that the term "corporation" is not limited to the artificial entity usually known as such, but includes also both an association and "a trust classed as an association because of its nature or its activities."

The Regulations, in the next following section (19.3797-2), make it clear that the term "association" is not used in the Revenue Code in a narrow or technical sense, but includes any organization, "which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity." It is said to be immaterial whether such organization is created by an agreement, *a declaration of trust,* a statute, or otherwise; and that "Massachusetts," "common law," "business," and "investment" trusts are included.

The Regulations carefully distinguish an association from a trust (19.3797-3). As differentiated from an ordinary trust for the conservation of property, an association is declared to result from an arrangement whereby the legal title is conveyed to a trustee, who, under a declaration or agreement of trust, holds and manages the property "with a view to income or profit" to the beneficiaries. Such arrangement is designed to afford a medium for carrying on an income or profit-seeking activity through a substitute for a voluntary association, joint-stock company or corporation—thus obtaining the advantages minus the disadvantages of those forms of organization. The nature and purpose of a cooperative undertaking will differentiate it from an ordinary trust; and "the purpose will not be considered narrower than that which is formally set forth in the instrument under which the activities of the trust are conducted." If the trust is an undertaking or arrangement conducted for income or profit, "the beneficiaries are to be treated as voluntarily joining or cooperating with each other in the trust, just as do members of an association, and the undertaking or arrangement is deemed to be an association classified by the Internal Revenue Code as a corporation." The Regulations emphasize that the Internal Revenue Code disregards the technical distinction between a trust agreement and ordinary articles of association or a corporate charter, and all other differences in detail, and "treats such a trust according to its essential nature, namely, as an association," regardless of whether the beneficiaries form the trust; or, by purchase or otherwise, acquire an interest in an existing trust.

■ These regulations of the Treasury Department harmonize with the purposes of the statute; do not constitute an encroachment upon the legislative function; are in consonance with the interpretation of the statute by the highest judicial authority; and should accordingly be applied with forceful effect. When the interpretative regulations are so applied to the facts found by the Tax Court, the correctness of the decision of that tribunal upon the point in issue is manifest.

■ A trust is characterized as an "association" within the sweep of the statute, not by the actual exercise of, but by the existence of powers under the trust instrument. Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 361, 56 S. Ct. 289, 80 L.Ed. 263; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 373, 374, 56 S.Ct. 285, 80 L.Ed. 278; Marshall's Heirs v. Commissioner of Internal Rev-

225

enue, 3 Cir., 111 F.2d 935, 938, certiorari denied, 311 U.S. 658, 61 S.Ct. 13, 85 L.Ed. 422.

In the Morrissey case, supra, the Supreme Court declared that the character of the trust was determined by the trust instrument, and pointed to many attributes of a corporation which we find characteristic of the trust in the instant case. Chief Justice Hughes said: "An enterprise carried on by means of a trust may be secured from termination or interruption by the death of owners of beneficial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking. It is no answer to say that these advantages flow from the very nature of trusts. For the question has arisen because of the use and adaptation of the trust mechanism" 296 U.S. 344, 359, 56 S.Ct. 296, 80 L.Ed. 263, supra.

In Helvering v. Coleman-Gilbert Associates, supra, the court declared 296 U.S. 369, at page 374, 56 S.Ct. 287, 80 L.Ed. 278: "The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted. Undoubtedly they wished to avoid partition of the property of which they had been co-owners, but their purpose as declared in their agreement was much broader than that." The mere fact that the operations of the "associates" were designedly far more extensive than those intended by the trustors in the instant case does not weaken the binding authority of the clear-cut principle announced.

That the trust with which we are concerned should be classed as an "association" under the pertinent revenue act is indicated also by two other decisions of the Supreme Court. In both Swanson v. Commissioner of Internal Revenue, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273, and Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275, the trusts, as in the two cases already discussed, were held to be taxable as "associations" under the revenue acts. In the Swanson case, the trust property consisted of one apartment house. The trustees held no formal meetings, kept no minute book, adopted no by-laws, elected no officers and directors, and took no "formal action with reference to the affairs of the property." [296 U.S. 362, 56 S.Ct. 284, 80 L.Ed. 273] In the Combs case, the common enterprise, under the trust agreement, was the acquisition of an oil lease; the drilling and operation of an oil well thereon; sale of the products and sale of the well; and the distribution of income among the beneficiaries of the trust.

In Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949, Massachusetts trusts were held to be associations within the meaning of the Revenue Act, where properties were conveyed to trustees and managed by them in business operations; the shares of the beneficiaries being represented by transferable certificates which entitled the holders to share ratably in the income and, upon termination of the respective trusts, in the proceeds of the property.

Expressions in earlier opinions of the Supreme Court must yield to its more recent pronouncements; and so, certain cases upon which petitioners rely have been weakened as applicable authority. Moreover, these cases are plainly distinguishable from a factual viewpoint: Crocker v. Malley, 249 U.S. 223, 39 S.Ct. 270, 63 L.Ed. 573, 2 A.L.R. 1601; Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; McCoach v. Minehill & S. H. R. Co., 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842; United States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825.

Whether the trust form was employed for "doing business" is one of the tests to be considered. See Solomon v. Commissioner of Internal Revenue, 5 Cir., 89 F.2d 569; Tyson v. Commissioner of Internal Revenue, 7 Cir., 68 F.2d 584; United States v. Rayburn, 8 Cir., 91 F.2d 162; Willis v. Commissioner of Internal Revenue, 9 Cir., 58 F.2d 121. In these cases from other circuits, the trustees were held to have been engaged in sufficient activities to constitute "doing business," so as to render the trusts taxable as associations. In the instant case, the acts of the trustee beyond the collection and distribution of the rents from the trust property have been heretofore enumerated.

226

In Von Baumbach v. Sargent Land Co., 242 U.S. 503, 516, 517, 37 S.Ct. 201, 61 L. Ed. 460, the Supreme Court held that a corporation which handled a large property, sold lots and saw to it that lessees performed their contracts was "doing business" within the meaning of the Corporation Tax Law; no amount of business being required. It was made clear that what constitutes doing business must depend, in each instance, upon the particular facts of the case. See also United States v. Trust No. B. I. 35, etc., 9 Cir., 107 F.2d 22, where a trust was held to be doing business and, in consequence, liable to taxation as an association under the Internal Revenue Act.

■ Commissioner of Internal Revenue v. Vandegrift Realty & Inv. Co., 9 Cir., 82 F.2d 387, 390, pointed out that the purpose and the actual operation of a trust should control in the determination of whether the trust should be classified as an association for tax purposes. Slight consideration should be given to the form of organization under which the trust is operated. See Morrissey v. Commissioner of Internal Revenue supra. Compare United States v. Davidson, 6 Cir., 115 F.2d 799, 801; Fidelity-Bankers Trust Co. v. Helvering, 72 App.D.C. 1, 113 F.2d 14, 17, 18, '19; Helvering v. Washburn, 8 Cir. 99 F. 2d 478, 481.

The petitioners cite three decisions of this circuit, none of which, in our view, sustains their contention. The trust, held in United States v. Davidson, 6 Cir., 115 F. 2d 799, not to create a taxable association, had for its primary purpose the conversion of the trust property into money for distribution of the proceeds among the beneficiaries. The activities of the trustee were merely incidental to liquidation and final distribution. There was no joint enterprise, moreover; the district court had found "upon uncontradicted evidence that the trust was not formed, or continued, by the voluntary act of the beneficiaries."

■ In Cleveland Trust Co. v. Commissioner of Internal Revenue, 6 Cir., 115 F.2d 481, it was held that the mere receipt of income from leased property and its distribution to cestuis que trustent amounts to no more than receiving the ordinary fruits arising from ownership of property, and does not constitute "doing business" of such character as would typify the trust as an "association" and accordingly render it taxable as a "corporation." The land trust had been created as a method in general use in Cleveland, Ohio, of "financing real estate loans as a substitute for an outright mortgage." The Cleveland Trust Company transferred to itself, as trustee, property upon which it had executed a ninety-nine year lease, and issued and sold to the public land trust certificates. In all the circumstances of the case, the investment land-trust was held not to be carrying on business for profit. As was said in the opinion, 115 F.2d page 483, "the line of separation between trusts and associations is often so vague as to make them almost indistinguishable." Each case must be adjudicated upon its own facts. We regard the powers vested in the trustee in the instrument under present consideration far more extensive than those possessed by the Cleveland Trust Company—so extensive, indeed, as to differentiate the cases. In the present litigation, the intent underlying the creation of the trust was obviously more corporate-minded; and the entire set-up of the trust bore greater resemblance to corporate practice and procedure.

The issues in C. A. C. Building Site v. Commissioner of Internal Revenue, 6 Cir., 119 F.2d 420, being substantially identical with those in Cleveland Trust Co. v. Commissioner of Internal Revenue, supra, the parties stipulated that the cause should be remanded for proceedings consistent with the opinion in the earlier case.

Marshall's Heirs v. Commissioner of Internal Revenue, 3 Cir., 111 F.2d 935, 938, certiorari denied 311 U.S. 658, 61 S.Ct. 13, 85 L.Ed. 422, supra, is well worth study as revealing many features of marked similarity to what is faced here. The salient characteristics of the trust involved in that case were held sufficient to constitute a "business trust" and consequently an "association" taxable as a corporation; even though the trustee did not exercise all of the powers conferred. Judge Biggs said: "Many of the indicia of the business trust as referred to by the Supreme Court in the Morrissey case, 296 U.S. [344] at page 359, 56 S.Ct. 289, 80 L.Ed. 263, are present. The trustee holds the title to the property 'embarked' in the enterprise. The trustee as a continuing trustee affords uninterrupted management of the property. Management is centralized in the trust and continuity remains uninterrupted except by the death of the last surviving beneficiary or the termination of the lease. The transfer of beneficial interests to minor children of the beneficiaries is contemplated.

\* \* \* The trustee possesses the broad powers necessary to carry on a business for profit. For example, with the consent of a majority in interest of the beneficiaries it may borrow money to construct a building upon the premises and sell at public or private sale the whole or any part of the real estate. It is our opinion that these powers transcend those of a trustee under a traditional trust. The broad powers conferred upon the trustee by the indenture were not exercised, but we think this to be immaterial. Such powers may be exercised by the trustee if necessary. We conclude that the trust is a business trust and the trustee is engaged on behalf of the beneficiaries in the handling of their real estate for profit."

 Another case, which, in determinative aspects, bears similarity to the case at bar is Title Insurance & Trust Co. v. Commissioner of Internal Revenue, 9 Cir., 100 F.2d 482, 485. There, the court stated: "The fact that there was only one piece of property is unimportant. Swanson v. Commissioner [of Internal Revenue] supra [296 U.S.] pages 363, 365, 56 S.Ct. 283 [80 L.Ed. 273]. So, also, is the fact that, in the taxable year (1933), the trustee's activities were confined to the collection and distribution of rents, payment of taxes, bookkeeping and other incidental duties. The purpose of the trust is found in the instrument which created it. The parties are not at liberty to say that it had a different or narrower purpose. Helvering v. Coleman-Gilbert Associates, [296 U. S.] page 373, 56 S.Ct. 285 [80 L.Ed. 275]; Commissioner [of Internal Revenue] v. Vandegrift Realty & Investment Co.,- 9 Cir., 82 F.2d 387, 390." The same Circuit Court of Appeals, in a later case, said that in determining whether a trust is an association taxable as a corporation, "it is not alone what the trustees did during the taxable year, but what they were empowered to do." Porter v. Commissioner of Internal Revenue, 9 Cir., 130 F.2d 276, 280.

(2) The petitioners insist that no taxable event has occurred within the meaning of the Revenue Act. Section 115(c) of the Internal Revenue Code. Their argument runs that prior to the creation of the trust, those persons who became cestuis que trustent held the legal title to undivided interests in real estate; that, after the creation of the trust, they owned equitable interests in the same undivided portions in the same real estate; that, upon termination of the trust, their interests were again converted into legal interests; that under Ohio law Senior v. Braden, 295 U.S. 422, 55 S.Ct. 800, 79 L.Ed. 1520, 100 A.L.R. 794, certificates of beneficial interest in a land trust are not personal property, but are real estate; and that, therefore, they have at no time owned anything different from that which they owned at any other time. They say that nothing has been taken from principal and added to income; that, having sold nothing, they have not received a taxable gain; that any increase in the value of their real estate is merely an unrealized capital increment; that when the trust was terminated, no distribution occurred, the beneficiaries merely receiving "a different sort of a piece of paper evidencing the same property interest." They assert that the transaction cannot be likened to "a liquidating distribution of a corporation." They point to the similarity of the principle of decision in Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L. Ed. 521, 9 A.L.R. 1570, in which common stock dividends were held not to be taxable as income.

 The argument is not impressive. Section 115(c) of the Internal Revenue Code provides that amounts received in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock; and that the resultant gain or loss to the distributee shall be recognized. As has been previously stated, the Internal Revenue Code, Section 3797 defines the term "corporation" as inclusive of an association. The statutory definition applies to the entire act. Burk-Waggoner Oil Ass'n v. Hopkins, 269 U.S. 110, 113, 46 S.Ct. 48, 70 L.Ed. 183.

 In Tyrrell v. Commissioner of Internal Revenue, 5 Cir., 91 F.2d 500, 502, it was held that the provision of the Internal Revenue Act, Revenue Act 1926, 201 (c), 26 U.S.C.A.Int.Rev.Code, § 115(c), that "amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock" applies to Texas unincorporated joint stock associations, which, under Texas law, are partnerships; and that, upon dissolution, the Tyrrell Trust, a joint stock association, was taxable as a corporation. It is important to observe that a similar argument to that made by petitioners in the instant case, based on local Ohio law, was rejected. The court stated that the authorities had made "it clear that for the

purpose of federal taxation the Congress is not limited by the conception of relations entertained under state laws"; and that within its powers, Congress "may determine for itself what taxes to levy, and how and when they shall fall." See Burk-Waggoner Oil Ass'n v. Hopkins, 269 U.S. 110, 114, 46 S.Ct. 48, 70 L.Ed. 183; Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199. In the last cited case, the Supreme Court said: "State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law."

We conclude that the petitioners realized long-term capital gains upon the final liquidation of the trust in 1939, within the intent and meaning of Section 115 (c) of the Internal Revenue Code.

The decision of the Tax Court is affirmed.