**MAIN–HAMMOND LAND TRUST et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 11529.

United States Court of Appeals
Sixth Circuit.

Dec. 11, 1952.

Leo Weinberger, Cincinnati, Ohio, Leo Weinberger and Jerome Frank, Cincinnati, Ohio, on the brief, for petitioner.

Walter Akerman, Jr., Washington, D. C., Ellis N. Slack and Walter Akerman, Jr., Washington, D. C., on the brief, for respondent.

Before HICKS, ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

The sole question presented in this petition to review is whether the Main-Hammond Land Trust, petitioner, is a business trust created and operated for profit on

behalf of its beneficiaries. The Commissioner determined that Main-Hammond was an association taxable as a corporation within the purview of § 3797, Internal Revenue Code, 26 U.S.C.A. § 3797, which provides that "The term 'corporation' includes associations * * *" and determined an income tax deficiency of $1,940.-77 for the taxable year ended June 30, 1949. The petition to review attacks the decision of the Tax Court of the United States sustaining the Commissioner's determination. The facts are stipulated; no oral testimony was introduced. The pertinent findings of fact of the Tax Court are stated in the margin.[1]

1. On April 5, 1946 Stanley M. Cooper offered to purchase certain property in Cincinnati, Ohio, for a price of $90,000. Cooper made a down payment of $30,000 within thirty days and executed a note for $60,000 and a mortgage for the balance due. To reimburse himself for the $30,000 and the commission which he agreed to pay, Cooper borrowed $35,000 from Mildred J. Bode. A month later Cooper purchased two parcels of real estate adjoining the first parcel for a price of $50,000. He paid the purchase price and borrowed $30,000 from Edith A. Baker and $20,000 from Florence B. Harrell. At the same time he entered into an agreement to lease all three of the lots to I. E. Clayton, who was then the tenant of the lots and was operating parking lots thereon. The lease from Cooper to Clayton was executed May 28, 1948 to begin July 1, 1948 for the term of 99 years, renewable forever, with privilege of purchase. On July 27, 1948 Cooper paid The Central Trust Company the balance of $60,000 due on its note and mortgage and immediately executed two deeds to The Southern Savings Bank & Trust Co. as Trustee for the three parcels. The conveyances to the Trustee were all subject to the perpetual lease from Cooper to Clayton.

Also on the same day that the above transactions took place, July 27, 1948, the Trustee executed an Agreement and Declaration of Trust as of July 1, 1948. The agreement was with such persons, partnerships, associations and corporations as became parties to the agreement by the acceptance of certificates of equitable ownership issued under the Declaration of Trust. The certificates were known as Main-Hammond Land Trust certificates. The Declaration of Trust recited that the Trustee would hold the real estate so conveyed to it in trust for the holders of Main-Hammond certificates and that the premises were subject to the perpetual lease from Cooper to Clayton, some of the provisions of which were set out therein.

The equitable ownership and beneficial interest in the trust estate was divided into 330 equal interests represented by Main-Hammond Land Trust certificates. The trust agreement provided that out of the rents received by the Trustee, it was to pay its compensation and expenses, including legal fees which might be incurred. After making such payments and paying all taxes and any income taxes which it might be required to pay, it was to distribute $25 per annum on each land trust certificate.

The agreement further provided that after making the above payments the Trustee would set aside $825 a year in a fund to be known as the guarantee fund, to guarantee the payment of $25 a year on each certificate and the performance of the other provisions of the lease. If there then remained any surplus income in the hands of the Trustee, such income would be distributed on July 1 of each year to the certificate holders in proportion to their respective interests as evidenced by the total amount of certificates issued and outstanding at that time. Each fractional interest was subject to purchase for the guarantee fund at a price of $550 the first year, $547.50 the second year, $545 the third year and reducing $2.50 each year thereafter so that in the twenty-first year and subsequent thereto each interest was subject to purchase at $500, plus its proportionate share of rental distributable in respect thereto.

The agreement also provided that whenever there was $500 or more in cash in the guarantee fund, the Trustee could purchase Main-Hammond certificates obtainable upon tender to it or in the open market at no more than $500 for each interest. If the funds in the guarantee fund were not exhausted in the voluntary purchase of certificates at $500 for each interest, then on July 1st of each year, provided there was at least $1,100 in cash in the guarantee fund, the Trustee was to purchase certificates by lot for the appropriate amount. These certificates were not to be canceled but were to constitute a part of the principal of the guarantee fund. The sum of $825 per year to be set aside in the guarantee fund, was one-half of one per cent of $165,000, the sale price of the Land Trust certificates by Cooper, so that not more than an average

Petitioner contends that within the holding of this court in Cleveland Trust Company v. Commissioner, 6 Cir., 115 F.2d 481, the Main-Hammond Land Trust was cre-

of one-half of one per cent of the outstanding certificates could be redeemed in any one year.

The trust agreement further provided for centralized management by the Trustee as representative of the certificate holders, one such provision reading, in part, as follows:

In the event any Lessee shall make default in any of the provisions of its lease and it becomes necessary, or in the sole opinion of the Trustee, advisable for the Trustee to terminate the same, or in the event of the termination of said lease in any other manner, the Trustee shall give two (2) weeks' notice of such termination to the beneficiaries by Registered Mail addressed to their respective addresses as the same appear on the books of the Trustee, and such notice shall be deemed to commence with the mailing thereof. The Trustee shall thereupon manage said trust estate and be fully authorized to take such steps with respect to selling, leasing, operating or otherwise disposing thereof as it may deem advisable and for the best interests of the beneficiaries, without reference to the beneficiaries and as if it were the sole legal and equitable owner thereof, and no person dealing with the Trustee shall be bound to inquire concerning the authority of the Trustee so to act or see to the application of the purchase money.

In the event that the Lessee under the Clayton lease exercised the privilege of purchase, the Trustee was authorized to complete the sale and convey the trust estate to the lessee without securing the consent of the beneficiaries. The proceeds of the sale were then to be distributed equally among the beneficiaries upon the surrender by them of their respective certificates. In such event the certificates in the guarantee fund would not participate. In case of default by the lessee, the Trustee could sell, as he saw fit, part of the guarantee fund and use the proceeds to pay rentals and to perform lessee's obligations. Alternatively, the Trustee could forfeit the lease and hold the guarantee fund for the benefit of the certificate holders.

The trust agreement could be terminated at any time by mutual consent between the Trustee and all beneficiaries. Unless terminated it was to continue as an entity during the existence of the Clayton lease, any renewal thereof, or any lease or leases made by the Trustee. The beneficiaries had equitable but not legal title and could not require partition. No assessment could be made upon the certificate holders and their personal liability was limited to their initial investment. The Trustee could borrow funds needed to meet a temporary exigency or to comply with the provisions of the lease. In so doing it could bind the assets of the trust estate but not the Trustee or the beneficiaries personally. It specifically provided that in any written contract reference should be made to the agreement and declaration of trust and all parties contracting with the Trustee should look only to the trust estates.

The Trustee kept a register with the names and addresses of the beneficiaries and proper books of account. There was a provision for issuing new certificates in case of loss or destruction, upon furnishing bond.

The agreement contained certain exculpatory provisions for the Trustee's protection. It was entitled to indemnity from the trust estate for all personal liability or expense incurred by it except such as arose from its own act, neglect or omission.

There was a provision for resignation of the Trustee and appointment of a new trustee by beneficiaries representing three-fourths or more of beneficial interests, or by the Common Pleas Court of Hamilton County, Ohio, in case the beneficiaries failed to appoint a successor trustee.

The Trustee and the lessee under the Clayton lease or any leases thereafter made by the Trustee, might from time to time amend leases or the trust agreement as they might deem necessary to carry out its purposes not inconsistent with the terms and purposes of the lease or agreement.

The land trust certificates provided for their transfer by assignment executed in the presence of two witnesses, with the formalities of a deed under Ohio law, including acknowledgment before a Notary Public.

On the same day the Trustee issued to Cooper 330 Land Trust certificates in exchange for the three parcels deeded by him to the Trustee, Cooper transferred 60 interests, 40 interests, and 70 interests, respectively, to Baker, Harrell and Bode for the amounts due them on the privileges to purchase from each. Cooper sold the remaining Land Trust certificates at $500 for each interest.

ated for the purpose of financing loans and hence was the ordinary trust, not taxable as an association. The Government urges that the case is similar to, and controlled by, the holding of this court in Sherman v. Commissioner, 6 Cir., 146 F.2d 219, which determined that a land trust displaying many features of the trust in the instant case was an association taxable as a corporation. The Tax Court grounded its opinion squarely upon the holding in the Sherman case.

■ The essential distinctions between the ordinary trust and a trust which is an association and thus, under § 3797, Internal Revenue Code, taxable as a corporation, have been described by the Supreme Court in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 295, 80 L.Ed. 263. In that case the trust involved was held to be an association. The Supreme Court pointed out that an ordinary trust does not constitute an enterprise for the transaction of business. In what are called "business trusts" the Supreme Court stated: "the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." To constitute an association taxable as a corporation the trust must be an enterprise for the doing of business. It must also have substantial

quasi corporate powers and attributes. Here it is undisputed that the trust exhibits these characteristics. It provides for the continuity of the trust undisturbed by the death of a certificate holder, for trust certificates transferable after the manner of stock transfer, for centralization of control and management, and for the limitation of liability to the trust assets.

■ The crucial question is whether the trust was organized for a business purpose. In solving this question the underlying purpose for the creation of the trust must be considered. Helvering v. Coleman-Gilbert, 296 U.S. 369, 56 S.Ct. 285, 80 L. Ed. 278. In that case the Supreme Court declared, 296 U.S. at page 374, 56 S.Ct. at page 287: "The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." The circumstance that only one piece of property was involved is immaterial. Swanson v. Commissioner, 296 U.S. 362, 365, 56 S.Ct. 283, 80 L.Ed. 273; Title Insurance & Trust Company v. Commissioner, 9 Cir., 100 F. 2d 482, 485. The fact that in the taxable year the trust activities were confined to the collection and distribution of rents, the payment of taxes, bookkeeping and other incidental duties is also immaterial. Title Insurance & Trust Company v. Commis-

Prior to creating the land trust and issuing the certificates, Cooper had qualified the Land Trust certificates with the Division of Securities of the Department of Commerce of the State of Ohio.

The receipts and disbursements of the Trustee for the fiscal year in question were as follows:

| | | |
|---|---|---|
| Rent received from Clayton | | $10,000.08 |
| Disbursements: | | |
| Check Printing | $ 10.30 | |
| Trustee's Fee | 300.00 | |
| Attorney's Fee | 213.93 | 524.23 |
| Balance | | $ 9,475.85 |
| Amount Distributed to Beneficiaries | | 8,540.50 |
| Net Income Taxable to Fiduciary if the Trust is taxable as a Trust Estate | | $ 935.35 |

The above distribution of $8,540.50 included quarterly distributions at the rate of $25 per year on 330 interests, or

a total of $8,250, plus a distribution of 85 cents per interest as of July 1, 1949, or a total of $280.50 out of the balance of the rent on hand July 1, 1949.

The only activity of the Trustee during the taxable year consisted of receiving the rent from its lessee; making the three disbursements set out above; making distribution quarterly by check to the beneficiaries; keeping records of receipts and disbursements to the beneficiaries and of transfers of Land Trust certificates; issuing new certificates on transfers; and holding the liability insurance policy delivered to it by Clayton. No Land Trust certificates were ever purchased, by call or otherwise, for the guarantee fund.

Cooper's total cost, including expenses, for the Main-Hammond Land Trust, was $152,256.01. His sale price of the Land Trust certificates was $165,000.

sioner, supra, 100 F.2d 485; Porter v. Commissioner, 9 Cir., 130 F.2d 276, 280; Sherman v. Commissioner, supra. The fact that the land was deeded to the trustee subject to a perpetual lease does not affect the question. A long-term lease existed upon the trust property involved in Marshall's Heirs v. Commissioner, 3 Cir., 111 F.2d 935. The trust was held to be taxable as an association.

Here the Tax Court found that the central motive for the establishing of the trust was the hope of realizing profit. If this finding of fact is firmly grounded in the evidence it binds this court. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 607, 68 S.Ct. 715, 92 L.Ed. 898.

The settlor was president of a company which was a licensed securities broker. It is stipulated that the settlor had previously bought and resold tracts of real estate through the medium of the sale of fractional interests similar to those used in this case. He acquired the trust property here involved for resale. When the trust was created the settlor paid off certain loans and offered the balance of the certificates for sale through his brokerage house. The certificate holders or beneficiaries had no interest in the preservation of the particular property, but only in the profit on their investment. In this connection the trustee was authorized by the trust agreement to purchase outstanding certificates at private sale or in the open market, out of income. Such purchases would enhance the income rights of certificate holders for they would increase the right of each certificate holder to future trust income. If the trustee purchased the certificates at less than their par value, the income rights of certificate holders would be correspondingly increased. In event of default on the lease the trustee was authorized to operate the property, which consisted of various parking lots. This in turn involved the possibility of definite operation of a business requiring contracts for and the receipt of rental, thus constituting "an unambiguous business venture". Moline Properties, Inc., v. Commissioner, 319 U.S. 436, 440, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499.

As soon as the Commissioner determined the deficiency based upon his ruling that petitioner was an association rather than an ordinary trust, the beneficiaries terminated the trust, thus demonstrating their understanding that it was neither a real estate financing project nor a project for preservation of the property, but was in fact a business venture.

Treasury Regulations 111, Sections 29.-3797–1, 29.3797–2, and 29.3797–3, support the conclusion that the arrangement here constituted the creation of an association in which the trustee held and managed the property with a view to securing income or profit for the beneficiaries.

No purpose would be served by a prolonged discussion of the various cases dealing with this question. They have been extensively reviewed in Sherman v. Commissioner, supra. In that case the trust was created by members of a family and a stronger case than this was presented for holding that the trust was established for the purpose of preserving the particular trust property. In the Sherman case during the taxable year the trustee in fact transacted no business pertaining to the property. As the court there pointed out, citing Cleveland Trust Company v. Commissioner, supra: "The line of separation between trusts and associations is often so vague as to make them almost indistinguishable." [146 F.2d 226.] Each case must be adjudged upon its own facts. We think that the instant case is controlled by Title Ins. & Trust Co. v. Commissioner, supra, and by Sherman v. Commissioner, supra, rather than by the rule of Cleveland Trust Co. v. Commissioner, supra. The decision of the Tax Court is affirmed.

Judge HICKS participated in the hearing of this cause but died before the opinion was prepared.