George G. **ABRAHAM** and Herbert Abraham, Trustees of the Abraham Trust, Plaintiffs,

v.

**UNITED STATES** of America. Defendant.

Civ. A. No. C–66–175.

United States District Court
W. D. Tennessee, W. D.

Aug. 29, 1967.

John R. Stivers and Taylor Malone, Jr., Memphis, Tenn., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Stanley F. Krysa, Sherin V. Reynolds, Attys., Dept. of Justice, Washington, D. C., Thomas L. Robinson, U. S. Atty., Memphis, Tenn., for defendant.

## OPINION ON MOTIONS FOR SUMMARY JUDGMENT

BAILEY BROWN, Chief Judge.

Plaintiffs, George G. Abraham and Herbert Abraham, Trustees of the Abraham Trust, have sued the defendant, United States of America, for a refund of federal income taxes in the amount of $70,054.63 for the taxable years ending October 31, 1960, through October 31, 1963, which the Abraham Trust paid under protest. These income taxes were assessed as a result of the Internal Revenue Service's determination that the Abraham Trust was an association taxable as a corporation, under the Internal Revenue Code of 1954, § 7701, and Treasury Regulations § 301.7701.

Both plaintiffs and defendant have filed motions for summary judgment in this cause. This Court has heretofore heard oral argument on these motions; in addition, the Court has studied the depositions and relevant documents which are in the record, and we have had the benefit of supporting memoranda supplied by both sides to this controversy. There is, of course, no obligation on the Court to grant either of these motions merely because cross-motions for summary judgment have been filed, 6 Moore's Federal Practice 2247 et seq., and cases cited therein.

## BACKGROUND

For a period of approximately forty years prior to May 20, 1950, Abraham Bros. Packing Company (Abraham Bros.), a Tennessee corporation, was engaged in Memphis, Tennessee, in the business of slaughtering and processing livestock and in packing and selling meat, meat products, and meat by-products. In the operation of this business, Abraham Bros. owned a plant and premises, consisting of certain real estate, buildings, machinery, and other improvements, together with railroad sidings and sewage facilities. The business was a closely-held family corporation which, in 1950, had about five hundred employees.

For various reasons, the officers and stockholders of Abraham Bros. decided to cease operating as a meat packing-house and on May 20, 1950, the corporation leased its packing plant to Wilson & Co., Inc. The lease covered certain real estate, buildings, machinery, and equipment and was for an initial term of twenty years at an annual rental of $100,000 for each of the first two years and $80,-000 per year thereafter. At the expiration of the initial term, Wilson & Co. had an option under the lease to purchase the leased property for $500,000, and as an alternative, the lessee had the option to renew for an additional twenty years on the same terms and conditions, except that the rental was to be reduced during this second twenty-year period to $32,150.04 per year. At the end of the second twenty-year period, Wilson & Co. had the option to purchase the leased property for $100,000. If Wilson & Co. failed to purchase, the leased property was to revert to its owners. In general, the obligations with respect to the leased property, such as paying real estate taxes, fell on the lessee, although some remained with the lessor. As an example of the latter, during the first fifteen years of the lease, if it became necessary to erect facilities as a substitute for or an adjunct to the public sewage facilities, such installation was to be the joint responsibility of the lessor and lessee. On May 23, 1950, Wilson & Co. took possession of the premises, rehired most of the five hundred former employees of Abraham Bros., retained

George G. Abraham, one of the plaintiff trustees, as General Manager of the plant, and began making monthly payments to Abraham Bros. as provided for in the lease.

On October 30, 1950, the Board of Directors of Abraham Bros. voted to liquidate the corporation in not more than two years, and notice of the adoption of the plan of liquidation was given to the Commissioner of Internal Revenue as required by law.

On October 27, 1952, the stockholders of Abraham Bros., of whom there were over thirty, voted to direct the appropriate officers of the corporation to surrender its charter and this was done two days later. At this same meeting, the stockholders considered and approved a document entitled "Agreement and Declaration of Trust," which authorized the appropriate officers to convey all the assets of the corporation to Ben Abraham, George Abraham and George G. Abraham, as Trustees of the Abraham Trust, and this was done forthwith. The terms of this trust agreement are set forth hereafter.

In the early part of 1963, after negotiations among Wilson & Co., Inc., John Morrell & Co., and the trustees, the lease was terminated by agreement and the leased property was sold by the Abraham Trust to John Morrell & Co. for a cash payment of $500,000 and assumption of a mortgage on the leased property, the balance of which was $309,557.87. The proceeds of this sale were paid to the beneficiaries of the trust as final distributions.

From 1950 until its dissolution in 1952, Abraham Bros. filed corporate income tax returns and paid income taxes; from 1953 through 1959, the trustees have filed only fiduciary income tax returns and have paid no income tax. However, after an audit, the Internal Revenue Service determined that the Abraham Trust was an association taxable as a corporation and it was able to and did assess deficiencies in corporate income taxes and interest for the 1960–1963 taxable years in the total amount of $70,054.63. Plain-

tiffs thereupon filed corporate returns for these years and paid these taxes, all under protest. On April 21, 1965, claims for refund for the aforesaid amount were filed, these claims were disallowed, and plaintiffs thereafter instituted suit in this court.

### THE TRUST AGREEMENT

After certain preliminary statements, the trust agreement provided (in II) for the trustees to issue "certificates of shares" to the trust beneficiaries in an amount equal to the then present outstanding common stock of Abraham Bros. owned by each. The trustees were also empowered to issue additional certificates in the future, but only where a certificate holder wished to exchange his certificate for two or more certificates of a smaller number of units totaling the same amount as the original certificate.

The agreement (in III) gave the trustees entire control and management of the trust property, subject to outstanding leases. They were empowered to collect rents and perform all obligations of the landlord under outstanding leases and to convey title to all real estate owned by the trust if options were exercised; to sell all property, or any part thereof, not covered by outstanding leases when and under such terms as they might choose; to borrow money for temporary exigencies or for erecting any buildings on any land conveyed to them when and under such terms as they might choose; and to execute and deliver notes and execute deeds of trust or mortgage securities for any such sums borrowed. The trustees were empowered to exchange land and purchase additional land if they so chose; to grant releases and easements over any land owned or later acquired by the trust; to maintain suitable offices for the transaction of trust business; to incur any other expenses, including those incident to the hire of employees, agents, lawyers and servants; to execute, acknowledge, and record legal instruments for trust purposes; and to make all contracts and pay all expenses incidental to the conduct and operation of the trust.

The trustees (in IV) were to receive no compensation for their services, although the beneficiaries holding a majority of the shares could vote compensation for them at any time. The trustees (in VI) were a self-perpetuating body whose number was always to be kept at three, any vacancy to be filled by the surviving trustees.

The trustees (in VIII) were directed to collect all of the rental and other income of the trust, and annually or more often to divide the net income among the beneficiaries. Before paying any dividends, however, the trustees were empowered to set aside any sums they saw fit for sinking funds or contingency funds to repay loans or make repairs or meet unusual expenses. They were permitted to invest and reinvest any money coming into their hands in any assets or securities that they saw fit, and their decision as to what constituted net income was final.

The trustees (in IX) could call meetings of certificate holders at any time on their own initiative or upon the written request of any five certificate holders. It was provided (in X) that certificate holders could vote at any meeting in person or by proxy and further it was provided that the holders of a majority of the outstanding certificates could authorize the trustees to execute mortgages or deeds of trust upon the property upon such terms and conditions as the certificate holders saw fit. It was provided (in XI) for limited liability, that is, no contract of the trustees would be binding on the certificate holders personally, and all persons or corporations extending credit to or contracting with the trustees could look only to the trust property for the payment of their claims or contracts.

It was provided (in XII) that certificates were personal property and freely transferable, and that the transferees would be entitled to all the rights of the original certificate holders. It was provided (in XIII) that the trust would continue in effect for a period of seventy-five years, unless sooner terminated by the sale of all real estate owned by the trust; and it was further provided that the certificate holders, by majority vote, could authorize the trustees to extend the life of the trust for any period beyond the first seventy-five years. The trustees were empowered (in XIV) to sell the trust property and, if and when all the property had been sold, they were directed to divide the proceeds of the sale, after paying debts, among the certificate holders in proportion to the number of shares owned by each.

Finally, the trust agreement disavowed any intention "to create a plan for carrying on business in the ordinary corporate sense" and recited that the trust was created solely because Abraham Bros. was in the process of liquidation. It further provided that "the trust hereby created shall not be deemed or considered a trust operated for financial profit, but stands merely in a fiduciary capacity to said holders of certificates. * * * "

## ACTUAL TRUST ACTIVITIES

In contrast to the very broad powers granted to the trustees under the trust agreement, the actual activities of the trust during the period 1952–1963 were much more limited.

The property comprising the original trust corpus was composed of the land, improvements and equipment which were rented to Wilson & Co.; a tract across the street which was unimproved real estate; a second mortgage note; a small unsecured note; and some additional machinery and equipment not rented. No additions of real or personal property were made to the trust corpus. The trustees were never compensated for their services, and, as a matter of fact, one trustee was employed in Illinois beginning in 1955 and did not return to Memphis permanently until 1966. The beneficiaries apparently held only one meeting, and that was held in 1963 to approve the sale of the leased property to John Morrell & Co.

The major activities of the trust during the 1952–1963 period consisted of the collection of the rent from Wilson & Co. on a monthly basis and the distribution

of these funds on a quarterly basis to the beneficiaries; the termination of the lease to Wilson & Co.; and the sale of this same property to John Morrell & Co. and the distribution of the cash proceeds to the beneficiaries.

These were not, however, the sole activities of the trust during this period. The trustees sold part of the unimproved tract of real estate to Major Realty Company on May 26, 1954, the net proceeds of which were $67,056.75 (including cash and notes); and they sold a small parcel of this tract to Wilson & Co. on the same day for $750.00. They sold another parcel of this tract to Howard Sowell on March 2, 1955, the net proceeds of which were $71,036.19; and they sold a small strip to Howard Sowell on May 17, 1955, for a consideration of $3,000.00. In addition, the trustees obtained a loan of $10,000.00 from a local bank using collateral on June 9, 1954, which loan was repaid in full on November 8, 1954. The trustees collected the aforesaid second mortgage note in full in 1954, and partially collected the unsecured note, charging off the remainder as a bad debt in 1959. The machinery and equipment not subject to the lease were lost or written off. Finally, the trustees maintained small offices during this period, primarily for the storage of records; incurred moderate expenses for insurance, travel, secretarial assistance, telephone use, professional services, and rental of a safe deposit box; and made one charitable contribution of $100.00. Two of the trustees died; one vacancy was filled, but the other had not been filled when the trust was terminated.

## LAW

The Internal Revenue Code of 1954 does not define under what circumstances an "association" will be taxed as a corporation. Section 7701 simply provides:

"§ 7701. Definitions

(a) * * *

(1) Person.—The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.

(2) * * *

(3) Corporation.—The term 'corporation' includes associations, joint-stock companies, and insurance companies."

The Regulations (§ 301.7701–2(a) (1)) provide that "the term 'association' refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation * * *" They provide that the major characteristics ordinarily found in a corporation which together distinguish it from other organizations are (1) associates, (2) an objective to carry on business and divide the gains therefrom, (3) continuity of life, (4) centralization of management, (5) limited liability and (6) free transferability of interests. It is provided that "an organization will be treated as a corporation if corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey v. Commissioner (1935) 296 U.S. 344 [56 S.Ct. 289, 80 L.Ed. 263]." However, the Regulations (§ 301.7701–2(a) (2)) further provide that since centralization of management, continuity of life, free transferability of interests, and limited liability are generally common to trusts and corporations, the determination of whether a trust that has these characteristics is to be treated as a corporation will turn on whether there are also associates and an objective to carry on business for profit.

It is the contention of plaintiffs that, under a proper interpretation of the foregoing provisions in the Regulations, a trust may not be treated as an association taxable as a corporation unless there are associates and an objective to carry on business. The Government contends that, under a proper interpretation of these provisions and particularly in view of the holding in *Morrissey* (which, as seen, in cited in the Regulations), a trust is to be treated as an association taxable as a corporation, if, considering all the foregoing factors, it more nearly resembles a corporation. While we believe that plaintiffs have the better of this Regu-

lations-interpretation argument, it is not necessary for us to resolve it because, as will be seen, the Government is entitled to prevail even upon the assumption that there must in all events be associates and a business objective.

(a) Associates.

■ The law seems to be clear that where owners of property convey it to trustees to be administered for them, particularly where the trustees are also beneficiaries, the trustees and beneficiaries are "associates" for purposes we are now considering. Monrovia Oil Co. v. C. I. R., 83 F.2d 417, 419 (9th Cir. 1936); Second Carey Trust v. Helvering, 75 U.S.App.D.C. 263, 126 F.2d 526, 528 (1942); Solomon v. C. I. R., 89 F.2d 569, 571 (5th Cir. 1937). The fact that the beneficiaries do not exercise control is not determinative. Helvering v. Combs, 296 U.S. 365, 368, 56 S.Ct. 287, 80 L.Ed. 275, 277 (1935).

(b) Business objective.

■ Where the trust instrument itself reflects an objective to carry on business for profit, this is determinative even though the activities of the trustees, in retrospect, do not indicate such an objective. This conclusion is amply supported by the following cases: Morrissey v. C. I. R., 296 U.S. 344, 360–361, 56 S.Ct. 289, 80 L.Ed. 263, 272–273 (1935); Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 373–374, 56 S.Ct. 285, 80 L.Ed. 278, 281 (1935); Sherman v. C. I. R., 146 F.2d 219, 227 (6th Cir. 1944); Main-Hammond Land Trust v. C. I. R., 200 F.2d 308, 311 (6th Cir. 1952); Sears v. Hassett, 111 F.2d 961, 962–963 (1st Cir. 1940); Second Carey Trust v. Helvering, 75 U.S.App.D.C. 263, 126 F.2d 526, 528 (1942); Keating-Snyder Trust v. C. I. R., 126 F.2d 860, 862 (5th Cir. 1942); United States v. Hill, 142 F.2d 622, 623 (10th Cir. 1944); C. I. R. v. City National Bank & Trust Co., 142 F.2d 771, 775 (10th Cir., 1944), cert. denied 323 U.S. 764, 65 S.Ct. 118, 89 L.Ed. 612; Adkins Properties v. C. I. R., 143 F.2d 380 (5th Cir. 1944); National Metropolitan Bank v. C. I. R., 145 F.2d 649, 652 (4th Cir.

1944); C. I. R. v. Security-First Nat. Bank, 148 F.2d 937, 938–939 (9th Cir. 1945); Fletcher v. Clark, 150 F.2d 239, 241 (10th Cir. 1945), cert. denied 326 U.S. 763, 66 S.Ct. 144, 90 L.Ed. 459; Titus v. United States, 150 F.2d 508, 510, 162 A.L.R. 991 (10th Cir. 1945), cert. denied 326 U.S. 773, 66 S.Ct. 230, 90 L.Ed. 467; United States v. Homecrest Tract, 160 F.2d 150, 152 (9th Cir. 1947); Buckley v. C. I. R., 231 F.2d 204 (2nd Cir. 1956); Rohman v. United States, 275 F.2d 120, 124–125 (9th Cir. 1960). It is true that in C. I. R. v. Gibbs-Preyer Trusts Nos. 1 & 2, 117 F.2d 619, 622–623 (6th Cir. 1941), our Court of Appeals, without discussing or even citing the *Morrissey* or *Coleman-Gilbert* cases, supra, holds to the contrary. So, also, may Cleveland Trust Co. v. C. I. R., 115 F.2d 481 (6th Cir. 1940) be interpreted to hold to the contrary. If so, both of these cases, with all respect, are sports in the sense that they have no post-*Morrissey* antecedents, and they have no progeny in this Circuit, for, as indicated, in *Sherman*, supra, and in *Main-Hammond*, supra, our Court of Appeals held consistently with *Morrissey* and *Coleman-Gilbert*.

■■ Moreover, statements as to the status or objectives of a particular organization, made by the parties in the agreement, may be considered by the Court but obviously are not conclusive, Solomon v. C. I. R., 89 F.2d 569, 570 (5th Cir. 1937), for the simple reason that they may not be consistent with the powers granted in the instrument. The purpose of the trust must be gathered from the entire agreement and may not be determined from a single sentence, paragraph, or statement. C. I. R. v. City National Bank & Trust Co., supra, 142 F.2d at 776; United States v. Hill, supra, 142 F.2d at 623.

■ The circumstance that only one major piece of property was involved is not material in determining whether the trust's objective was to carry on a business, and, moreover, the fact that in the taxable years in question the activities of the trustees were chiefly confined to the collection and distribution of rent,

the payment of taxes, the sale of the leased property, bookkeeping, and other incidental duties and the fact that the principal piece of property was deeded to the trustees subject to a long-term lease are likewise not material. Main-Hammond Land Trust v. C. I. R., supra, 200 F.2d at 311–312, and cases cited therein. Even where no business had been conducted at all during a taxable year, it was nevertheless determined, in the *Morrissey* case, supra, that there was a business purpose. The lack of formal meetings, resolutions, by-laws, minute books, seals, officers and other minor corporate analogies is not controlling. Swanson v. C. I. R., 296 U. S. 362, 364, 56 S.Ct. 283, 80 L.Ed. 273, 275 (1935).

■ We are not to be interpreted as holding that the actions, as opposed to the powers, of the trustees are never to be considered in determining whether there is an objective to carry on business, for in some instances, the actions of the trustees may be determinative. Thus in situations where the stated purpose of the trust and the powers granted in the trust instrument would indicate that there is no such purpose, but the actual activities of the trustees and beneficiaries indicate otherwise, courts have held that there was an objective to carry on business and have treated the trust as an association. See: Nee v. Main Street Bank, 174 F.2d 425 (8th Cir. 1949); Anderson v. Lamb, 222 F.2d 176 (8th Cir. 1955); and Reynolds v. Hill, 184 F. 2d 294 (8th Cir. 1950). Thus it seems that an objective to carry on business will be found if the trust instrument so indicates *or* if the activities of those involved so indicate.

## CONCLUSION

■ We are compelled to the conclusion that, under applicable authorities and under the facts that are undisputed, the Abraham Trust must be treated as an association taxable as a corporation.

There were associates because the corporation's shareholders surrendered their shares in Abraham Bros. in return for the conveyance by the corporation of its assets to the Trust and the issuance to them of certificates representing shares in the Trust, and the trustees were also beneficiaries of the Trust, and the beneficiaries, under the trust agreement, retained certain powers with respect to the operation of the Trust. These facts satisfy the requirements of all tests to be found in the cases.

There was also an objective to carry on a business and to divide the gains. Without again setting out the relevant provisions in the trust instrument, the powers granted to the trustees are quite broad, including the power to buy and sell any assets, to borrow money and give security therefor, to make improvements on property, and to create reserves. They were authorized to maintain offices and hire employees and lawyers. The very length of time that the Trust was to exist, which could be extended, is inconsistent with the objective of liquidation. The Trust was to carry on the very same business that the corporation itself had carried on from 1950 to 1952.

Under the law as we conceive the law to be and under the undisputed facts, we can see no issue that could be submitted to a jury. The trust instrument, to the extent that it grants the powers and authority above set out, is unambiguous and, in any event, construction of the instrument would be for the court. The other facts upon which we rely in reaching this conclusion, such as the fact that the Trust took over the operations of Abraham Bros. as they were in 1952, are not in dispute. We therefore conclude that the Government is entitled to a summary judgment and that plaintiffs' motion for a summary judgment must be denied.

Counsel will prepare a judgment for entry.