NATIONAL SAVINGS & TRUST COMPANY, Trustee of Alonzo O. Bliss Properties, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1407–65.

United States District Court District of Columbia.

April 29, 1968.

John E. Powell, Drury, Lynham & Powell, Washington, D. C., for plaintiff.

Walter Tribbey, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

This is an action to recover certain federal income taxes paid by plaintiff taxpayer in the years 1960 and 1961, together with statutory interest. The claims for refund are based on two contentions. Taxpayer asserts that it is a trust or association for tax purposes and should not be considered taxable as a corporation, and, alternatively, if it is to be taxed as a corporation, that certain payments made by it during the years in question should be treated as deductible interest expenses rather than as dividends paid. The Internal Revenue Service did not allow either claim. A total of $352,268.36 for the two test years is involved, of which $6,263.07 represents assessments relating to alleged interest expenses. Suit was filed under the provisions of 28 U.S.C. §§ 1346 and 1402.

Facts and exhibits in this case were stipulated and accordingly the matter was presented to the Court on papers. The issues have been thoroughly briefed and argument was had on the facts and law.

At the outset the provisions of the Deed of Trust Indenture under which plaintiff taxpayer now acts as sole trustee should be delineated. On December 20, 1911, before the Income Tax Act was passed or the Sixteenth Amendment adopted, Alonzo O. Bliss and his wife transferred several parcels of real estate, including improvements, thereon, located in the District of Columbia to trustees under an Indenture of that date. The instrument provided for the issuance of 4% bonds payable semi-annually in the aggregate amount of $2,-000,000 to Bliss as consideration for the creation of the trust. The trust was to last 30 years, unless sooner terminated, after which the properties were to be disposed of and the net proceeds, plus accumulations, were to be distributed to the bondholders. It was expressly provided that the bonds were a lien on the properties consigned to the trust and on

any future property acquired. The Indenture specified that no instrument executed and delivered by the trustees affecting the title to real estate would be valid unless signed by Bliss while he was alive and thereafter unless authorized by resolution of a majority of the bonds.

The trustees were charged by the express terms of the Indenture with the responsibility to manage the property and any other property thereafter acquired by the trust, to collect rents and profits and to rent, sell, lease and mortgage. Regular and special meetings of bondholders were authorized. Each bond of record was entitled to one vote. The bondholders were authorized to adopt by-laws for the internal management and government of the trust "not inconsistent with the provisions of the instrument" and this was done at the first meeting of the bondholders on December 26, 1911. Under the Indenture the trustees were responsible to the bondholders and bound to perform the will of a majority of bondholders, subject to immediate ouster on failure to do so. The bondholders by majority at any regular or special meeting were expressly authorized to change the trustees or terminate the trust entirely. The bondholders were and are the sole equity owners of the plaintiff.

The trust did not terminate in 30 years as originally contemplated. The bondholders by unanimous vote on January 30, 1940, extended the maturity date of the bonds from January 1, 1942, to January 1, 1972, subject to acceleration at any time prior thereto by majority vote at any regular or special meeting of the bondholders. The record does not reflect the reason for this action.

In the period from 1911 to the end of 1961 there were 50 annual meetings and 65 special meetings of the bondholders. The original trustees no longer serve. Mr. Bliss, who created the trust, died before the tax years in question. Plaintiff became trustee in 1951 under the original Indenture, as extended, and is compensated at $10,000 per annum for its services. In the years 1960 and 1961, the trustee held title to 13 or 14 apartment buildings and 5 contiguous lots used for parking. The trust also contained cash and some securities.

The bondholders have regularly elected two officers; a Secretary-Treasurer and General Manager, compensated at approximately $30,000 per annum; and a Chairman, compensated in excess of $11,000 per annum. The General Manager, who was then a bondholder, was responsible for some 94 employees, including resident managers, janitors, elevator operators, and secretarial and managerial employees at a rented office maintained by the bondholders. The trustee was available for consultation with the officers on important matters involving more than normal operation and maintenance and advised and acted for bondholders in various respects, as will appear later in more detail.

The Internal Revenue Service determined that plaintiff taxpayer was an association taxable as corporation for federal income tax purposes in 1925 and corporate income tax returns have been filed for each year since 1925.

Against this factual background the applicable provisions of the Internal Revenue Code and decisions thereunder may be considered. The question whether a trust or association should be taxed like a corporation has been constantly before the Federal Courts. Various theories have evolved over the years and a great variety of differing fact situations have been presented. It is impossible to reconcile the decisions and rulings nor would it serve any useful purpose to attempt to do so. A full treatment of the problem and the course the development of the law has taken is found in Mertens, Law of Federal Income Taxation, Vol. 7, Ch. 38A.

In 1935 in Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 56 S. Ct. 289, 80 L.Ed. 263 (1935), the Court laid down certain controlling principles which the parties in this litigation ap-

pear to agree should be applied to the facts of this particular case. *Morrissey* and the three cases immediately following (Swanson v. Commissioner of Internal Revenue, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (1935); Helvering v. Combs, 296 U.S. 365, 56 S.Ct. 287, 80 L. Ed. 275 (1935); Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S. Ct. 285, 80 L.Ed. 278 (1935)) all deal with the factors to be taken into account in determining whether a trust or association has the requisite characteristics of an association taxable as a corporation for federal income tax purposes.

Section 7701(a) of the Internal Revenue Code of 1954 provides that the term "corporation" includes associations. Association is not elsewhere defined in the Code. Regulations 118 (26 CFR Pt. 39), in effect in 1960, and T.D. 6503, in effect in 1961, attempt to provide more definitive content to these terms. The regulations are detailed, complex and necessarily intentionally flexible. Without repeating them *in extenso* it is emphasized that the term "association" is not used in any narrow or technical sense and that each situation is to be determined on its own particular facts after considering both the formal papers and the practices thereunder. These regulations are consistent with the controlling decisions of the Supreme Court of the United States cited above. *Morrissey* and *Coleman-Gilbert* are particularly pertinent on the facts of this case.

█ Any association in the very nature of things is likely to have some corporate characteristics. The question before the Court in a case of this kind is whether a particular association is sufficiently analogous to a corporation to bring the enterprise under the congressional intent to tax it as a corporation. There is no single factor or litmus test that can be applied. The ingenuity of man and the varied, ever-changing complexities of business life have brought about an incredible variety of differing fact situations to which the rational and

inexact holdings of the cases must be applied.

It is not disputed that we are concerned with an enterprise which carries on business for profit. Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949 (1924). While there has been only a limited turnover of properties, there is here presented an enterprise designed to do more than merely protect and conserve property in anticipation of liquidation. In this context five factors receive particular consideration when the association-versus-corporation issue is tendered and are emphasized by the applicable regulations (§ 301.7701–2(a) (1)), to wit:

(1) Continuity of existence.

(2) Transferability of interests.

(3) Title in a single entity.

(4) Limited liability.

(5) Centralized management.

Each of these will now be discussed.

*Continuity of existence.* The original trust was to run for 30 years. Its life was extended by unanimous vote of the bondholders until 1972, another 30 years. The bondholders may terminate existence by appropriate vote any time before this date. It is most likely that business and tax considerations will result in a further extension. As a practical matter there has been a continuity of existence. As the minutes of January 27, 1963, recite, it has been "the policy to expand and build up the business in the way of making it a permanent going concern."

*Transferability of interests.* Transfers can take place. The only restriction is the requirement created by unanimous agreement of the bondholders in 1940 that bonds first be offered to the trustees for first refusal at the price set by the bondholder. Some bonds have been redeemed by payments of premium amounts. Others have been transferred. As a practical matter, interests may be transferred.

*Title in a single entity.* The trustees have title, subject only to the lien in favor of the bondholders.

*Limited liability.* The Indenture provides for limited liability. There is some authority found in state cases suggesting that under certain circumstances this provision of the Indenture might not stand up. Bogert, Trusts and Trustees (2d ed.) §§ 294–297, incl.; First National Bank of New Bedford v. Chartier, 305 Mass. 316, 25 N.E.2d 733 (1940); and In re Conover's Estate, 295 Ill.App. 443, 14 N.E.2d 980 (1938). Federal law obviously controls. No case has been found in the District of Columbia dealing with bondholders' liability in a situation such as that before the Court and there is no federal law. Under these circumstances the limited liability provisions of the Indenture itself are controlling in determining the tax question here before the Court.

*Centralized management.* This is undoubtedly the single, most important factor. The applicable Treasury regulations which are wholly consistent with the decisions in *Morrissey* are set forth below:

Treasury Regulations § 39.3797–3(c) (effective for 1960) provides, *inter alia:*

(c) If a trust is an undertaking or arrangement conducted for income or profit, the capital or property of the trust being supplied by the beneficiaries, and if the trustees or other designated persons are, in effect, the managers of the undertaking or arrangement, whether the beneficiaries do or do not appoint or control them, the beneficiaries are to be treated as voluntarily joining or cooperating with each other in the trust, just as do members of an association, and the undertaking or arrangement is deemed to be an association, classified by the Internal Revenue Code as a corporation.

Treasury Regulations § 301.7701–2(c) (effective after 1960) provides, *inter alia:*

(c) *Centralization of management.* (1) an organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed.   *   *   *

(2) The persons who have such authority may, or may not, be members of the organization and may hold office as a result of a selection by the members from time to time, or may be self-perpetuating in office. See Morrissey et al. v. Commissioner [of Internal Revenue] (1935) 296 U.S. 344 [56 S.Ct. 289, 80 L.Ed. 263]. Centralized management can be accomplished by election to office, by proxy appointment, or by any other means which has the effect of concentrating in a management group continuing exclusive authority to make management decisions.

*   *   *   *   *   *

(4) There is no centralization of continuing exclusive authority to make management decisions, unless the managers have sole authority to make such decisions. For example, in the case of a corporation or a trust, the concentration of management powers in a board of directors or trustees effectively prevents a stockholder or a trust beneficiary, simply because he is a stockholder or beneficiary, from binding the corporation or the trust by his acts.   *   *   *

The United States points to the terms of the Indenture giving the trustees managerial responsibility, to the minutes which indicate that the bondholders ratified rather than initiated many significant decisions and to the role of the trustees in guiding financial and other policies pertaining to the operation of the enterprise in conjunction with the bondholders elected officers. Plaintiff taxpayer urges that the terms of the Indenture are passé and that in practice the trustee's functions are ministerial and primarily of a safekeeping, non-policy nature; that the bondholders make

all decisions in the manner expected of associates who gather at frequent regular and special meetings, and that the only staff or management functions are performed by individuals with custodial and daily operating responsibility but devoid of any policy position or discretion on matters of consequence to the long-term development of the enterprise.

There were no live witnesses and the vital facts relating to this phase of the dispute are made somewhat cold and uninformative by stipulated proofs. All of the minutes of annual and special meetings of the bondholders for the period from 1954–1961 are, however, in evidence, together with selected minutes of other meetings prior to 1954. An examination of the minutes reflects participation by the bondholders, the trustee and the officers in the conduct of the affairs of the enterprise. While it is clear that the bondholders involve themselves directly in some major policy matters and approve major real estate transactions, the atmosphere of the minutes as a whole is quite typical of the minutes of some stockholder meetings where operating results are carefully reviewed, past actions submitted for ratification and important matters of planning and policy are determined, relying on the advice of appointed representatives.

The trustee and the officers are responsible for management. An indication of the role of the trustee is found in the following examples taken from the 1954–1961 group of minutes. The trustee was directed to try to arrange a trade of certain properties and to raise needed funds as it saw fit; to arrange for funds to be raised by mortgages to cover remodeling wherever recommended by the management; to retain counsel to defend a suit by a bondholder; to arrange loans to bondholders; to negotiate an important lease with an oil company; to retain and consult with tax counsel; to appraise properties; to negotiate various real estate deals; to negotiate with a bondholder for a plan to liquidate his interest; and to sell stock. Recommen-

dations for remodeling "of the management" were accepted and loans by its trustee ratified. The management was given discretion to make capital improvements in their judgment and to increase mortgages as seem wise and prudent. Often the impetus for these directions came from the trustee, acting in the financial interests of the bondholders, or stimulated by approaches made to the trustee by outside third parties contemplating business arrangements with the enterprise.

From these examples and other indications on the minutes as a whole it is apparent that although the trustee did not operate with the full freedom of a board of directors, the trustee's activities were not purely ministerial but in fact managerial in many respects under a procedure involving continuing close contact with bondholders, sharing management responsibility with the bondholders elected officers. No matter of financial consequence appears to have gone forward without the advice and consideration of the trustee and the day-to-day management of the properties was in the hands of bondholder officers who worked closely with the trustee. While, like most minutes, the minutes here are cryptic and lean, it must be kept in mind that the enterprise had a gross annual income in 1961 and 1962 of over $1,000,000 and showed assets valued at many times that figure.

At each annual meeting the Secretary read a report of the past year's activities, which report was then approved by the bondholders. The bondholders are not, however, mere rubber stamps. Bondholders apparently deliberate, have some disagreement and sometimes participate in decisions on detail. Large bondholders appear interested and involved. Details of the management of the various properties such as lease terms, credit policies, salaries and other administrative but significant business problems were not determined by the bondholders at their meetings. Sales and purchases of real estate were con-

sidered and action taken by the bondholders. There were not many of these transactions and at least some were taken on the specific recommendation of the trustee.* It is impossible, however, to find from these papers that the somewhat divergent small group of Bliss relations and former associates now holding bonds function as true partners. A pattern for efficient operation has developed for which the trustee and designated representatives of the bondholders have primary responsibility and most of the advantages of centralized corporate organization have been substantially secured.

■■ Great weight must be given to the terms of the trust instrument, particularly where the implications of the trustee's activities are being considered. The taxpayer obviously cannot escape taxation by declining to exercise some or all of the powers which the Indenture grants. Second Carey Trust v. Helvering, 75 U.S.App.D.C. 263, 126 F.2d 526 (1942); Fidelity-Bankers Trust Co. v. Helvering, 72 App.D.C. 1, 5, 113 F.2d 14, 18 (1940); Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 374, 56 S.Ct. 285, 80 L.Ed. 278 (1935). In this instance the Indenture is explicit. It places full managerial responsibility in the trustee. While the trustee may be removed by the bondholders at will and the bondholders must release their lien on property, these limitations do not deprive the trustee of its centralized managerial functions under the Indenture, a responsibility which the trustee has in fact carried out at least in many ways as the review of the minutes above well demonstrates. This managerial responsibility, coupled with the profit-making characteristics of the enterprise, provides ample authority for the view that

the trust must be treated as a corporation for federal income tax purposes. A recent decision, Abraham v. United States, 272 F.Supp. 807 (W.D.Tenn. 1967), collects the authorities.

When all this is considered in the light of the voting procedures, the complexity and many ramifications of the enterprise, the procedures followed in taking out profits to be mentioned later, and the significance that must be given under the decisions to the provisions of the Indenture, particularly those placing management in the trustee, the Court concludes as a matter of law that the taxpayer is substantially more similar to a corporation than to an association and must be treated as such for income tax purposes. We are concerned with resemblance, not identity, as *Morrissey* emphasizes. Form is not as significant as substance and the crux of the issue is whether corporate circumstances have been achieved in practice. The incidents of taxation depend on the substance of the transaction and the decision here is compelled by the conduct of the participants and the instruments under which they function. Taxpayer has not met its burden. Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935).

■ As a second and alternative position, taxpayer claims the right to treat as interest and accordingly to deduct as an expense an amount equal to the 4% paid on the bonds in each of the years in question. Amounts paid bondholders in excess of 4% in those years would be treated as dividends.

This issue must be determined by an analysis of the true nature of the payments to bondholders and the nature of the security-designated bond which they

---

* Plaintiff in a Supplemental Memorandum served April 22, 1968, tendered a financial statement prepared by J. Lee Nicholson & Company, Certified Public Accountants, for the trustees for the year ending December 31, 1935, and asked that the statement be received as an exhibit. There being no objection, this request was granted and the exhibit has been considered by the Court. A comparison with a similar exhibit of a later date indicates the limited extent of property turnover.

hold. A candid bondholders' minute is particularly decisive on this issue. A minute of January 26, 1935, recites:

"It has been customary since the formation of the trust for the bondholders at their annual meeting to decide and declare the rate of interest to be paid on these bonds during each ensuing year, basing the rate as directors of a corporation declare dividends, on the earnings of the corporation for the past year."

On top of this, the following factors all point against treating the interest as deductible:

(1) The bondholders are the sole equity owners of the enterprise and control its operations by their vote. They and they alone take the risk.

(2) There is no fixed maturity date for the so-called debt. Originally 30 years, it was extended another 30 years and may be extended further. There is no enforceable obligation to pay a definite sum at a fixed time because, among other things, the maturity date of the bonds may be accelerated at any time by vote of a majority of the bondholders attending a regular or special meeting of the bondholders.

(3) There is no way under the terms of the Indenture that the debt can be paid off without liquidating the enterprise and there are neither business nor tax considerations that make this prospect even within serious contemplation. The resources of the enterprise were more than sufficient to satisfy the debt but this had not been attempted even in cases where bondholders were themselves indebted to the trustee as a result of borrowings.

(4) Interest at 4% has not been paid or accrued in every year. A sinking-fund provision of the Indenture (para. 12) to secure the payment of the bonds and interest has never been utilized.

(5) Payments have ranged from 0% to 10%, fluctuating with the operating results and the requirements of the bondholders in the handling of their individual affairs. Payments of at least 4% on the outstanding bonds was not made in eight of the first 30 years, i.e., 1923, 1930, 1931, 1932, 1934, 1935, 1940 and 1941. In 1945 trustees were given discretion to determine the amount of payment to be made in 1946. The Indenture provides that upon the default in payment of any installment of interest the trustees shall have the power and duty upon requests of a majority of the bondholders to sell the property in the trust at public auction for the benefit of the bondholders. While defaults occurred, there is no indication that the bondholders even considered exercising the prerogative thus given them under the Indenture.

This arrangement was not, of course, designed with income taxes in mind. Whatever the original intent and practice, the enterprise has so evolved that the securities which as pieces of paper have all the indicia of interest-bearing secured obligations have in fact as a matter of practice and law become pure equity obligations and the payments denominated interest can no longer by 1960–1961 be given the status of expense deductions under the clear rationale of the numerous decisions. It would be wholly artificial to treat the payments as interest under the conditions obtaining in 1960 and 1961. Mertens, Law of Federal Income Taxation, Vol. 4A, Ch. 26; Tomlinson v. 1661 Corporation, 377 F.2d 291 (5th Cir. 1967). Again, taxpayer has not met the burden as to this issue.

This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law. Judgment shall be entered in all respects for the United States, without costs. Counsel to submit an appropriate order in one week.